The argument this morning is D.M. Trans v. Scott. Mr. Anderson. Good morning, your honors. David Anderson of Baker Haas-Tetler here representing the appellant, Arrive Logistics. May it please the court, you're here today because the district court committed multiple reversible errors and abusing its discretion. I want to talk about mainly two of those here today. The first of which is when the district court found that the restrictive covenants at issue here are unenforceable due to a lack of controlling Texas law. The second being the court, the district court's determination that Arrive did not suffer irreparable harm. As to that first issue, the consideration issue, the district court both misapplied Texas law and further ignored substantial record evidence, most of which is admissions by the defendants themselves, that they received this consideration, the You know, Arrive seems to rely on recitations in the agreements that the disputed information constituted trade secrets. Is Arrive claiming that we as a court are bound by a legal conclusion that Arrive was fighted in the agreement? No, your honor. What we're arguing is that Arrive has met its burden of the information at issue is confidential information and trade secrets, which have been described equally by cases within this jurisdiction in similar fashion. So we're not asking the court to just rely on what the document says per se, but looking at the totality of the evidence, both what's in the agreement and the fact that we've met our burden under applicable case law. On the consideration piece, Texas law and the district court did note that Texas law applies to the contract issue based on the choice of law provision. That was correct, and in doing so, though, it failed to acknowledge a couple of key cases. The Sheshanoff case that we've cited, too, as well as the Weber case. The significance here is that district court looked in a very minute way at a very specific provision on the first page of the agreement about consideration. It didn't look at the whole contract. What we're talking about are restrictive covenants, and these restrictive covenants are dealt with in section 5 of the employment agreement, and it specifically states in express terms that ARRIVE promises to provide you employees with confidential information in exchange. What we want from you are these restrictive covenants, and the individual defendants agreed to that, and they agreed to the reasonableness of those restrictive covenants. And what that information contains, by and large, not exclusive, is the confidential customer information that ARRIVE has now in the Sheshanoff. Has the court exercised your right to delete the so-called confidential information from the defendants' personal cell phones and computers? I mean, it appears that the agreements give the company that right, and it seems somewhat odd to me that a company would seek an injunction without first taking that simple step to protect its supposedly valuable secret information. Your Honor, this court dealt with that very issue in Vandavo, not this court, I apologize, the Northern District of Illinois recently considered that very issue. ARRIVE did take very reasonable measures to protect its valuable trade secrets, and in the Vandavo case, the Northern District of Illinois looked at the very issue where  the employee... I don't think you're answering. Forgive me, but have you ever exercised your right to delete the so-called confidential information? The right we exercised was to have them sign confidentiality agreements, which is what the court in Vandavo held to. So ARRIVE did not go and scrub these personal computers, but they didn't need to. And then AON in Vandavo, it says you don't have to do that. As long as you take reasonable measures, you don't have to exercise a police state of observation and supervision over your employees, especially when, as here, these employees all signed confidentiality agreements agreeing not to disclose or use ARRIVE's confidential information outside the company. And when you look at it, ARRIVE took several steps. This is more of a trade secret argument, but they took several steps to protect its information over and above just those agreements. But those agreements, the key part here is the enforceability, because when the district court ruled, it didn't get to whether or not the contracts were breached. It never got to that full analysis. It punted, basically, when it said the agreements, the restrictive covenants portion, are unenforceable because they lack consideration. That doesn't just affect these six individual defendants. It affects a lot more employees that have that same contract. The information did ARRIVE give the district court that would allow the district court to evaluate the independent value of the updated information. The district court clearly seemed to determine that the categories were so vague that it couldn't evaluate the value of the information. And that's where the district court got it skewed from those same definitions that the same definitions ARRIVE provided for its trade secrets, Your Honor, were the same ones provided in Aon and Bendavo, where you have confidential customer information about who the key executive decision makers are. These are logistics companies. What are the typical, you know, load volumes and pricing and, you know, preferences of these customers? Things that aren't available to the public. We And in the court in Aon, the court in Bendavo, they said, yes, those are protectable trade secrets. And so, to your point, Your Honor, that was what was provided, in response to your question, to these employees when they were faced with this, these restrictive covenants. The case in Texas, the controlling Texas case, Sheshanoff said, even if these are existing employees, you had access already to confidential information. And then the employer says, if you will sign these restrictive covenants, we'll provide you with additional confidential information. And then the employer, and the agreements get signed, and the employer goes on and then delivers on that promise by providing additional confidential information. That is consideration. That makes them enforceable. What exactly, if you would help me, please, what exactly did ARRIVE give to these employees as consideration after, after they signed the subject agreements? Because it seems, it appears that much of what is claimed as new consideration was given before they signed the contracts. And Sheshanoff and Weber addressed that very issue, Your Honor. And in Weber, it was a similar fact pattern, where they... Why don't you just tell me what you did? I would be so grateful, because it would help me. Sure, Your Honor. So that, what the, what the employees had was access and provision of this confidential customer database. And what they received after the restrictive covenants were signed was updated new information into that customer database, which they used in their day-to-day jobs for ARRIVE. Their own testimony, Your Honor. So what information did you... Okay, so you're telling us that the answer is updated customer information. Yes, Your Honor. What information then did ARRIVE give Judge Lyna Weber that would allow the court to evaluate the independent value of this updated information? Because he says, the court said, it's so vague, the categories are so vague, that he couldn't evaluate. Your Honor, that's the part I mentioned earlier, where the court ignored the record evidence. And the record evidence here are the defendant's own admissions. That after they signed that agreement, what they received was updated customer information for the accounts they were working on within the database. And, this is the key part, they information they received from the database after they signed the agreements was new and different than the information they received prior to signing the agreements. That's the key distinction here. That's what Weber held. The fact that the database, it doesn't have, the confidential information doesn't have to be of a new or separate type or category. It can be the same type or category, so long as it's additional confidential information. And in Weber, they said the fact that the database, those employees had access to... How is the confidential information a benefit to the employees as opposed to a benefit to the employer? DM wanted its employees to be able to work from home. In order to do that, it had to offer access to the software and data. I can see a clear benefit to the employer. I can't see a clear benefit to the employee. It's a definite benefit to the employee, Judge, because that is how they get measured by how well they do their job. And, the more information they have about a client, they're not cold calling these folks, right? They've got customers from which the database is building important information, who the key decision makers are, what are their typical load volumes, where do they typically send shipments. That enables them to do their job better and hence become more successful. Suppose there were, forget about the restricted income, suppose there were an original contract and the employer says, here's the consideration we're giving you. At the end of the week, we give you a commission of X percent and we also make it possible for you to do your jobs. Would anybody view the second one as additional compensation? That, it seems to me, is the argument here. We make it possible for you to do your jobs. That's more compensation to you. Which is a benefit to these employees because without that information, they're not going to be as successful in their jobs. Dealing with the customers, but not having the information at their disposal. We give you an office compensation to the employee because without an office. We give you a computer compensation to the employee. We give you a phone line compensation to the employee. I mean, you can see my problem, I hope. Again, your honor, here's the key distinction. The office, the chair, the phone, sure, the tools of the trade that they could use, but what they don't, what the key difference here is, Arrive is the one that has compiled this information over a period of time and provides it to these employees on the database, which is highly competitive information, secret information, that you wouldn't want your competitor to have. Arrive bought the chair, bought the desk chair. There's nothing confidential about the chair. Before the employee arrived. Highly competitive business. Without desk chairs, it's not going to work. It's the nature, they can get a desk or a chair anywhere, your honor. They can't get this information. Look, what you're saying is, I think, this is information for which an employee might be willing to pay the employer because it's valuable to them. Helps them do their job. In the same sense that I recall when I started work at a law faculty, I had to buy my own typewriter. It wasn't provided by the company. Typewriter is important, but it wasn't. Well, you can see my problem, I hope. I can, but again, nothing confidential about the typewriter either, your honor, and I appreciate the example. But it was essential to do a scholar's job. Absolutely, and so I 100% agree with you, your honor. What is essential also for them to do their job is, they need a phone, they need a computer, they need those things, but they need this confidential information to do it, and what they're willing to give up in exchange for that are these restrictive evidence. They agreed to be bound by them, and now they're walking back on their word. Separately, and just to touch quickly on irreparable harm, the district court also got it wrong on irreparable harm. These are the very kinds of issues that are ripe for injunctions. Here arrive, even where the district court focused on, is that you can look at this contract or that business that was diverted, and you can come up with some lost profits analysis on that. But the case law within this jurisdiction is, there's ample case law here in precedential cases that say that's not enough, that's not really addressing the irreparable harm. The irreparable harm is the loss of the customer relationship from which flows other opportunities that you can't possibly calculate the true harm. And so because of that, even if I'm looking at Aon, I'm looking at Vandavo, looking at this court's recent decision, well a few years ago, not so recent, and Turnell and Hess, Judge Easterbrook, your own case in Hess, where when employees are using confidential information of their former employer to compete with them, it is ripe for injunctive relief and irreparable harm, because you just can't quantify the amount of harm being done. With that, unless your owners have any further questions, I'd like to reserve my remaining time. Certainly, counsel. Thank you. Mr. Boney. Good morning, Your Honor. I apologize that you had to buy your own typewriter. I'm amazed they have typewriters. What is a typewriter exactly? Can I ask the court that? Steve Judges of the Seventh Circuit, my name is Luke. Oh, I also would have had to buy Quill pens had I needed them. You got those at the Supreme Court. The Supreme Court hands them out for free in oral arguments. That's nice. Esteemed Judges of the Seventh Circuit, my name is Lucas Boehning, and I represent the seven defendants in this appeal. May it please the court. There was no abuse of discretion below, and I hope to get right into some of the questions that I heard. I can cover mootness, because I do think that that's a threshold issue, but I want to go right to this consideration piece based on some of the questions that I had heard. Could I just ask something of you? Would the employee defendants agree that the information in the Accelerate system was constantly being updated, and if so, why would that new, more current information not supply consideration? Is it because the secrecy of that updated information had no appreciable value over the original information? Is that it? I'm trying to figure it out. There's a few reasons why updating information in Accelerate does not constitute valid consideration for these subsequent agreements. As an initial matter, upon employment, ARRIVE requested that the individual defendants sign initial agreements, and in that agreement it contains the same language that provides you with confidential information. They were already under an obligation to provide confidential information as part of the employment relationship, and so it's still past consideration. Even if it was confidential information, it is still past consideration, and it is not consideration for the agreement under the pre-existing duty rule. So that's number one. The other reason, as Judge Easterbrook was asking and pointed questions, is that this was required for them to do their job. Access to Accelerate wasn't a part of this agreement. In fact, the reason that ARRIVE rolled out these agreements was a part of a compensation change, and that compensation change turned out to be a decrease in pay. And now, after that was eliminated through the discovery process, they're coming up with different reasons, different consideration that was never a part of the agreement. And so Accelerate is a necessary component for their jobs. This is nothing more than dressing up continued employment and masquerading it as independent consideration. ARRIVE had always had the option to fire the employees, and ARRIVE always had the option to terminate their access to Accelerate. If this was actually, the access was actually consideration, they would not have that discretion, and we would still have access today. But you will not hear ARRIVE say that that's a part of the deal, that you get to have access even after your employment ends, because it was always a part of the job. Does that answer? For me it does, I don't know. And a big portion of this is that under Texas law, Texas does not allow consideration to be contingent upon at-will employment, continued employment. And so the fact that these individual defendants were required to log into Accelerate and use this information on a day-to-day basis caused the court to say, I don't think that this is what was given. I don't think that this is of any value to them. And on top of that, if you look at the signatures on these new agreements, they were all signed at different dates. They were all signed on various times at the end of 2020 to 2021. It wasn't as if there was some magic switch. As soon as they went in to Accelerate after signing the agreement, they had access to all sorts of different information. No. The testimony of Scott Sondegger, who was ARRIVE's corporate representative, essentially said, look, we roll out, we're constantly updating this information. After they signed it, we updated pricing functionality. That's what we did. But they were going to do that regardless. This wasn't in consideration for signing these restrictive covenants, which are severe restrictive covenants. This was just a part of the job. There's a few other points that counsel raised in the trade secrets, in defending the trade secrets that I'd like to address. Simply having somebody sign a confidentiality agreement is not enough. Because up until that moment, when they resigned, they always had the right to have the information in their possession. And after that moment occurred, when they resigned, and they were suddenly not supposed to have that information, ARRIVE failed to take a single step. They didn't follow their policies that were laid out, and the employees were agreed to the policies where they could go in and access the information and delete it. They didn't even ask for it back in the litigation process. And even after our depositions, where each and every single one of them said, hey, we don't want this. We're not required to have it. We don't want it. You can have it back. There has still been no attempt by ARRIVE to get this information back, which caused the court to say, this is not the sort of thing that you would expect a level of reasonable protections, the level of reasonable protections required for trade secrets. I'd like to go back, having addressed some of the questions, and just talk briefly about mootness. This is a threshold issue, and as we laid out in a chart on page 1 of our brief, all of the non-competes have expired as of Tuesday. Those same mootness concerns don't apply to the trade secret claims, do they? Correct. So the trade secret claim, but we've never contested that we're using trade secrets or that we want to use trade secrets. So I don't think that there's a lot of controversy there, because we don't want their trade secrets. And in fact, Traffic Tech has put in specific contractual provisions in these agreements that say, hey, don't use anything from anybody else. We don't want you to use that. So we don't really dispute the trade secret. If they want us to agree that we won't use their trade secrets, that's fine. We're not doing that, and we're not going to do that. And the same thing with the individual defendants, Traffic Tech and the individual defendants. But I gather that DM is concerned that the individual defendants, put to one side the corporate defendant, that the individual defendants are using their trade secrets. The corporate defendant may promise not to do it, and indeed even the individual defendants may promise not to do it, but not everybody tells the truth all the time. I know this may be a surprise to you, but not everybody is a lawyer. I've been a lawyer for two to three years, but I have certainly learned that lesson very quickly, that not everybody tells the truth all the time. But here, Arrive was able to take sworn depositions of each and every single one of the individual defendants. So you're convinced that everybody under oath always tells the truth? No, no, I am not convinced of that, and I've also learned that lesson in my first couple years of practice. But there's nothing to contradict it, and in the case of Arrive, there's no evidence in the record that the three individual defendants that departed are working. I do know that that is public information, in the sense that they did update their profiles, and this goes to the irreparable harm, right?   If Arrive was truly concerned that these individuals had gone somewhere else, and were competing with them, that information would be in the record. It would not just be, well, they left Traffic Tech, they could go somewhere else, they would be following up in Discovery, they would be pursuing this information, and it is public information. I believe they've updated their LinkedIn profiles. But there is no, to that point, there is nothing in the record suggesting where they've gone. What's the status of the arbitrations between the individual, involving the individual defendants? It is in the infancy stage of things. They have filed their arbitrations. There was a brief skirmish over the locale of those arbitrations. After that skirmish was settled, to a certain extent, everything ceased. And so there has been no further progress on the arbitrations. These arbitrations, as you know, goes to the irreparable harm. They're seeking damages here. They're seeking monetary payment for the decrease in revenue. Now, Arrive talks about lost opportunities. But of the 13 customers that the defendant employees did business with at Traffic Tech, Arrive is still doing business with the majority of them, 11 out of the 13. Only two, they've stopped doing business, and those were close personal contacts of Scott Meyer. So these lost opportunities are more phantom lost opportunities. They don't have anything to show that this is actually occurring. And because this is very transactional, and most 3PLs, most companies allow multiple 3PLs to bid on their shipments, they're getting the same opportunities as Traffic Tech is. And so this lost opportunities is trying to do irreparable harm out of nothing. It's lost revenue. Sorry, I thought you were going to have a question. I'd like to talk just a little bit in the briefing about the extension clause that's there that Arrive relies on to kind of salvage these non-compete and non-solicitation. If you look at that extension clause and you read it in combination with this arbitration provision, it says that you can extend the non-compete for any period of breach. But a district court and this court cannot make a determination on breach. That is for the arbitrators. So when you read those together, what this really means is that Arrive has contractually required the individual defendants to agree that after they go get a decision from an arbitrator, they can come back and request a permanent injunction. It cannot be used in a preliminary injunction phase to extend the non-competes here before any determination of breach would occur. This wouldn't make any sense because then the arbitrator could issue an opinion and say, well, there was no breach, and so this extension would be completely invalidated. So they have to go to arbitration first to get that. And then on that same point... Before you get to the next point, would the extension itself require separate consideration? The extension itself. Would the extension itself require separate consideration as opposed from the restrictive covenants? Correct. I don't believe that it would under the case law. I have not looked at that specific issue, so I don't want to say yes or no firmly. I can certainly follow up with that. But I will say that this extension clause under Texas law, if Texas law applies to it, is invalid because it creates an indefinite extension. There's a great case from this district conveniently applying Texas law on an extension clause in Ree Roberts where it discusses the rule of law on extension clause. If you can't tell how long the non-competes are going to last from the get-go and you have to look backwards, it's invalid because it needs a finite end date. And that's exactly what this is. The defendant employees need to be able to move on without the threat of being pulled out of their positions at a different employer. They need that closure in order to enter back into the workforce. And so this has sound public policy reasons as well. Before you lose the remainder of your time, the issue of the tortious interference with What is your understanding as to the applicable law? Is that Texas state law? Is that Illinois state law? It's going to be Illinois law across the board. This was a preliminary ruling and we think that actually Illinois law is going to apply across the board, specifically on this consideration piece in the arbitration because you don't get Texas law unless the contract is valid. And the contract isn't valid, consideration is going to be applied. You're going to analyze consideration under Illinois law, which is where all the individual defendants lived and worked and performed all their duties. But you've taken that down a different route. I want to go back to this issue of currently. Is your current understanding as to the applicable state law for those two torts, Illinois, Texas, or some other entity? So I don't know if there's a conflict in terms of tortious interference versus Texas and but our argument would be that Illinois law would apply to those. In the second amended complaint, which is the operative complaint, the fact that it references Texas there, how do you respond to that? Where are you? I thought that those two torts referenced Texas law as being applicable to those claims. In the second amended complaint? Yeah. So I think that we would consider a choice of law. We would just conduct a normal choice of law provision. And the primary basis that they're claiming Texas law applies is because, well, we have a headquarters in Texas and there's a Texas law provision in the contract. But that contract has no bearing on those. And so we would do a normal choice of law analysis and it would come out to Illinois based on the weight of the contacts and based on all of the other factors that you would consider under that analysis. Before I sit down, it's an abuse of discretion standard. These were factual determinations made on a very full record. Judge Lineweber issued a very detailed opinion. He considered all of the arguments that arrived made before it, did not consider the arguments that arrived did not make, such as implicit promises that were made in the agreement, things that weren't raised below. But he considered all of the agreements, all of the evidence, and he issued a well-reasoned conclusion. And we ask that you affirm. Thank you, Your Honor. Thank you. Your Honors. Thank you, Counsel. Anything further, Mr. Anderson? Yes, Your Honor. Briefly, Your Honors. Under Texas law, arrives, provision of confidential information in connection with restrictive covenants, after those were signed, is sufficient consideration to enforce these contracts. Importantly, the individual defendants in their own disposition testimony, which is in the record, admit and underwrote that the information they received from arrive after signing the restrictive covenants is confidential information. They admit this. It's undisputed. I want to point out that there's so much more to address from opposing counsel, but this issue is ripe for consideration. The district court did abuse its discretion when it determined that there was no consideration to enforce these contracts. Under Texas law and under the evidence of this case, there is sufficient consideration. Those contracts are, and their restrictive covenants specifically, are enforceable. And arrive demonstrated a likelihood of success on the merits for its misappropriation of trade secrets claims. And it also demonstrated it has suffered irreparable harm. And real quick on that, Your Honor, the Hess case, this is the very type of thing you can't pin down because of the customer relationship. And it's that difficulty that makes it irreparable. Therefore, the court should remand the case back to the district court with instructions to issue a ruling consistent with Your Honor's findings. But you just explained to me how you can say irreparable when you did not wipe the information from the devices when you could have. Your Honor, because they're prohibited from using that under the agreements. The irreparable harm is already out there. That's the harm already caused. So whether we would have gotten the hard drives wiped or not, they've already contacted the And so they use the confidential information that they didn't have but for their employment at Arrive to go out and solicit their prior Arrive customers and divert that business away. And once that customer relationship is harmed the way it's been, that's irreparable because there's no way to know what opportunities we're losing out on as a result of their interference. Thank you. Thank you, Your Honor. Thank you very much. The case is taken under advisement. And the court will take a 10-minute recess before calling the third case.